**GROUP HEALTH PLAN, INC., a non-profit Minnesota health maintenance organization; HealthPartners, Inc., a nonprofit Minnesota health maintenance organization;  Plaintiffs,**

v.

**PHILIP  MORRIS  INCORPORATED; R.J.  Reynolds  Tobacco  Company; Brown & Williamson Tobacco Corporation;  British–American  Tobacco Company Limited;  Lorillard Tobacco Company; Liggett Group, Inc.;  United States Tobacco Company;  Hill & Knowlton, Inc.;  The Tobacco Institute, Inc.;  and the Smokeless Tobacco Council, Inc.;  Defendants.**

**Medica, a nonprofit Minnesota health maintenance organization and subsidiary of Allina Health System, Plaintiff,**

v.

**Philip Morris Incorporated;  R.J. Reynolds  Tobacco  Company;  Brown & Williamson  Tobacco  Corporation; British–American Tobacco Company Limited;  Lorillard Tobacco Company; Liggett Group, Inc.;  United States Tobacco Company;  Hill & Knowlton, Inc.;  The Tobacco Institute, Inc.;  and the Smokeless Tobacco Council, Inc.; Defendants.**

Nos. CIV 98–1036(PAM/JGL), CIV 99–1739(PAM/JGL).

United States District Court, D. Minnesota.

Jan. 31, 2002.

Lawrence Zelle, Lawrence T. Hofmann, Richard Michael Hagstrom, Eric E. Caugh, Zelle Hofmann Voelbel Mason & Gette, Minneapolis, MN, for Plaintiffs.

Peter W. Sipkins, Robert A. Schwartzbauer, Mark John Ginder, Randall R. Frykberg, Dorsey & White, Minneapolis, MN, Michael R. Geske, Murray R. Garnick, Arnold & Porter, Washington, DC, Jack L. Lipson, David Eggert, Unknown, Eric L. Dobberteen, Maurice A. Leiter, John L. Carlton, James L. Layden, Arnold & Porter, Los Angeles, CA, Charles Spicknall, Not Admitted, James Scarboro, Thomas Stoever, Alfred T. McDonnell, Arnold & Porter, Denver, CO, William Maledon, Osborn Maledon, Phoenix, AZ, James Stuart Simonson, Gray Plant Mooty Mooty & Bennett, Minneapolis, MN, Jeffrey J. Jones, Jones Day Reavis & Pogue, Columbus, OH, Jonathan M. Redgrave, Jones Day Reavis & Pogue, Washington, DC, Robert Klonoff, Unknown, Sydney B. McDole, Jill E. Tananbaum, Not Admitted, Jack Michael Fribley, Lori Ann Wagner, Faegre & Benson, Minneapolis, MN, Andrew R. McGaan, Kirkland & Ellis, Chicago, IL, Kenneth Bass, Karen DeSantis, Unknown, Richard A. Rice, Not Admitted, John Walter Getsinger, Minneapolis, MN, Amy Hendricks, Steven Vollins, Unknown, Michael Robert Docherty, Mark Allen Mitchell, Rider Bennett Egan & Arundel, Minneapolis, MN, Jeffrey S. Nelson, Susan D. Wolfe, J. Patrick Sullivan, Shook Hardy & Bacon, Kansas City, MO, Elizabeth Hoene Martin, Law Firm Unknown, Robert V. Atmore, Steven D. Kelley, Reuben A. Mjaanes, Lindquist & Vennum, Minneapolis, MN, James Stricker, Aaron H. Marks, Nancy E. Straub, Not Admitted, Joseph T. Dixon, Jr., Neil M. Kliebenstein, Henson & Efron, Minneapolis, MN, Marc Rachman, Unknown, Bruce M. Ginberg, Davis & Gilbert, New York City, Andrew D. Herz, Not Admitted, Robert Lawrence Purdy, Kirk O. Kolbo, Maslon Edelman Borman & Brand, Minneapolis, MN, Steven Klugman, Steve Michaels, Debevoise & Plimpton, New York City, Antoine Tinnion, Not Admitted, George W. Flynn, Hal A. Shillingstad, Flynn Gaskins & Bennett, Minneapolis, MN, Clifford M. Greene, Greene Espel, Minneapolis, MN, for Defendants.

**MEMORANDUM AND ORDER**

MAGNUSON, District Judge.

This matter is before the Court on Defendants' Motion for Summary Judgment

on Causation, Injury, and Damages and cross-Motions for Summary Judgment on the statute of limitations. For the following reasons, the Court grants Defendants' Motion for Summary Judgment based on causation, injury, and damages. It is therefore unnecessary for the Court to reach the parties' cross-Motions for Summary Judgment on the statute of limitations.

## BACKGROUND

For the purposes of these Motions, it is sufficient to note that Plaintiffs are health maintenance organizations ("HMOs") attempting to recoup increased health-care costs that they claim to have incurred as a result of their members' tobacco-related illnesses. Plaintiffs contend that they were directly and indirectly injured by Defendants' alleged conspiracy to mislead the public and the health-care industry regarding the deleterious and addictive effects of tobacco use. In short, Plaintiffs allege that they were injured because they have been required to assume the health-care costs sustained by their members as a result of tobacco use.

Following Motions to Dismiss and the Minnesota Supreme Court's opinion on two questions that this Court certified to it, *see Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2 (Minn.2001), Plaintiffs have five remaining claims for which they seek damages: three under Minnesota consumer protection statutes [1] and two under Minnesota's antitrust statutes.[2] Defendants have filed Motions for Summary Judgment on causation, injury, and damages as well as the expiration of the statutes of limitation. Plaintiffs have filed a cross-Motion for Summary Judgment on the statutes of limitation.

## DISCUSSION

### A. Standard of Review

Summary judgment is only proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219–20 (8th Cir.1992). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir.1996). As the Supreme Court has stated, however, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548.

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Ze-*

---

1. Minn.Stat. §§ 325D.13 (the Unfair Trade Practices Act), 325F.69 (the Prevention of Consumer Fraud Act), and 325D.13 (the False Statement in Advertising Act).

2. Minn.Stat. § 325D.49–.69.

*nith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. Defendants' Motion on Causation, Injury and Damages

Defendants contend that Plaintiffs' claims cannot survive summary judgment because they have failed to create a genuine issue of material fact regarding whether Defendants' alleged misconduct caused Plaintiffs' damages. Defendants essentially argue that (1) Plaintiffs bear the burden of proving causation and damages on both their consumer protection and antitrust claims; (2) Plaintiffs have failed to prove causation and damages on both . sets of claims because they have not adduced sufficient evidence from their participant populations; and (3) Plaintiffs have only one expert witness,. Dr. Jeffrey Harris, who purports to provide the necessary causal link or nexus between Defendants' alleged misconduct and Plaintiffs' alleged damages, but Dr. Harris' testimony is inadmissible under *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For the following reasons, the Court agrees and therefore ·grants Defendants' Motion for Summary Judgment.[3]

### 1. Burden of Proof

#### a. *Consumer Protection*

■ The Minnesota Supreme Court determined that Plaintiffs in this case "must demonstrate that [D]efendants' conduct had some impact on their members' use of tobacco products that caused their damages." *Group Health,* 621 N.W.2d at 14. Although the court in *Group Health* ruled that "traditional common law reliance" was

not a separate element of Plaintiffs' statutory consumer protection claims, Plaintiffs retain the burden of proving a causal link or nexus between the alleged misconduct and the claimed harm. *See id.* at 15 ("In order to prove their claims for damages ... the [Plaintiffs] must establish a causal nexus between their alleged damages and the conduct of the [D]efendants alleged to violate the statutes.").

Plaintiffs, nevertheless, contend that causation should be presumed in this case. Arguing for what would amount to a radical sea change in Minnesota consumer protection law, Plaintiffs claim that Defendants' expenditure of "substantial funds in an effort to deceive consumers and influence their purchasing decisions" entitles them to such a presumption. *U–Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1041 (9th Cir.1986). Alternatively, Plaintiffs contend that because it is self-evident that advertising influences consumers' decisions, the Court may presume that Defendants' false advertising actually deceived the public. *See F.T.C v. Brown & Williamson Tobacco Corp.,* 778 F.2d 35, 41 (D.C.Cir.1985) (noting that a court may rely on its own experience and understanding of human nature to "find the deception 'self-evident' ") (citations omitted).

The Court finds Plaintiffs' arguments unpersuasive. Plaintiffs' first argument rests on the dubious proposition that footnote 11 in *Group Health,* merely listing examples of a "variety of approaches" which this Court might consider when assessing whether causation exists, somehow shifts the burden of proof on causation from Plaintiffs to Defendants. *See Group Health,* 621 N.W.2d at 15 n. 11. In light of

---

**3.** Because the Court rules in favor of Defendants based on these arguments, it need not consider the merits of Defendants' remaining arguments that Plaintiffs' claims are preempted by the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. § 1331, *et seq.,* that

Plaintiffs have failed to prove an antitrust injury, and that Plaintiffs proposed proof of causation, injury, and damages would violate due process and Defendants' right to a jury trial.

the Minnesota Supreme Court's refusal to provide in any detail "what manner of proof will be necessary to establish the necessary connection between [Plaintiffs'] claimed damages and [D]efendants' conduct," *id.* at 15, this Court declines to elevate the examples in footnote 11 to a burden-shifting rule in consumer fraud cases.[4]

Indeed, to do so would contravene the express language of *Group Health.* While the Minnesota Supreme Court believes that the Minnesota legislature intended to relax the requirements of pleading and proving causation in consumer fraud actions, it is clear that the legislature did not do away with these requirements. The court specifically noted that

> as a practical matter it is not possible that the [Plaintiffs'] damages could be caused by a violation [of the consumer fraud statutes] without reliance on the statements or conduct alleged to violate the statutes. Therefore, in a case such as this, *it will be necessary to prove* reliance on those statements or conduct to satisfy the causation requirement.

*Id.* at 13 (emphasis added). As Defendants point out, the court in this passage assumed that Defendants had fraudulent intent but nonetheless stated that Plaintiffs must establish causation.

Plaintiffs' second argument that the Court may presume causation in this case because of the self-evident reality that advertising affects consumer decisions is also unavailing. Once again, the express language of the Minnesota Supreme Court in *Group Health* militates against such a presumption. Accordingly, the Court finds that Plaintiffs bear the burden of proving that a causal nexus or link exists between Defendants' conduct alleged to have violated the consumer protection laws and Plaintiffs' claimed damages.

### b. *Antitrust*

■ Noting that Minnesota courts have repeatedly stated that Minnesota's antitrust statute is to be interpreted consistently with federal courts' construction of federal antitrust law whenever possible, *see, e.g., Minnesota Twins P'ship v. State ex rel. Hatch,* 592 N.W.2d 847, 851 (Minn. 1999); *see also State by Humphrey v. Alpine Air Prods., Inc.,* 490 N.W.2d 888, 894 (Minn.Ct.App.1992), Defendants point out that Plaintiffs must prove with "reasonable certainty" that the alleged anti-competitive conduct of Defendants was the cause of their damages. *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 893 (8th Cir.1978).

Plaintiffs counter by arguing that they are entitled to a presumption of causation on their antitrust claims. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (citations omitted) ("[T]he fact finder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their ten-

---

4. In any event, the Lanham Act cases cited in footnote 11 of *Group Health* do not support Plaintiffs' sweeping proposition that causation should be presumed in all consumer fraud cases where a defendant acts intentionally to deceive. Such a presumption does not apply in Lanham Act cases involving "general grievances" about a defendant's advertising because the result would be to give each plaintiff "a windfall unrelated to its own damage." *Heidi Ott A.G. v. Target Corp.,* 153 F.Supp.2d 1055, 1073 (D.Minn.2001) (quoting *Porous* *Media Corp. v. Pall Corp.,* 110 F.3d 1329, 1334 (8th Cir.1997) ("[W]here a defendant is guilty of misrepresenting its own product without targeting any other specific product, it is erroneous to apply a rebuttable presumption of harm in favor of a [plaintiff].")); *see also Balance Dynamics Corp. v. Schmitt Indus., Inc.,* 204 F.3d 683, 694 (6th Cir.2000) (stating that "the presumptive damages rule [extends] only to cases of comparative advertising where the plaintiff's product was specifically targeted").

dency to injure ... that defendants' wrongful acts ... caused damage to the plaintiffs.").

*Zenith,* however, does not obviate the need for Plaintiffs to establish causation. Plaintiffs must show that Defendants' alleged violations of the Minnesota antitrust law were a "material cause" of Plaintiffs' injuries. *See Zenith,* 395 U.S. at 114 n. 9, 89 S.Ct. 1562; *Amerinet, Inc. v. Xerox Corp.,* 972 F.2d 1483, 1495 (8th Cir.1992) (stating that in order to establish sufficient evidence of causation, plaintiff needed to establish that defendant "violated the antitrust laws, that these violations had a tendency to injure plaintiff's business, and that plaintiff suffered a decline in its business not shown to be attributable to other causes"). Although a more lenient standard of proof with regard to the amount of damages is available, Plaintiffs may only earn this standard after they have shown that they have "in fact suffered antitrust injury caused by [Defendants'] anticompetitive wrongdoing." *Amerinet,* 972 F.2d at 1494; *see also U.S. Football League v. Nat'l Football League,* 842 F.2d 1335, 1378 (2d Cir.1988) ("Whatever latitude is afforded antitrust plaintiffs as to proof of damages, however, is limited by the requirement that the damages awarded must be traced to some degree to unlawful acts.").

### 2. Proof from Participant Populations

■ In *Group Health,* The Minnesota Supreme Court determined that Plaintiffs "need not include direct evidence of reliance by individual consumers of [D]efendants' products" to establish causation for their consumer protection claims. *Group Health,* 621 N.W.2d at 14.

Rather, the causal nexus and its reliance component may be established by ... circumstantial evidence that the district court determines is relevant and probative as to the relationship between the claimed damages and the alleged prohibited conduct.

*Id.* Thus, as Plaintiffs contend, they can meet their burden of proving causation and damages through circumstantial proof such as consumer surveys or studies. Similarly, Plaintiffs may rely on circumstantial evidence to establish causation for their antitrust claims. *See St. Louis Convention and Visitors Comm'n v. Nat'l Football League,* 154 F.3d 851, 863 (8th Cir.1998). The critical question, however, is how closely tethered this circumstantial evidence needs to be to the Plaintiffs' participant population to be "relevant and probative."

■ Defendants argue that Plaintiffs must adduce evidence from their participant populations demonstrating that Defendants' alleged misconduct caused them harm. *See Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 264 (5th Cir.1980) (stating that "the persons interviewed ... [must] adequately represent the opinions which are relevant to the litigation"); *Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Board of Podiatric Surgery, Inc.,* 185 F.3d 606, 616 (6th Cir. 1999) (affirming a grant of summary judgment because plaintiff's proffered evidence did not demonstrate that "those parties plaintiff labels as its consumers ... were deceived"). Because Plaintiffs have not presented any proof that their participants either collectively or individually smoked and suffered harm because of anything that Defendants did or said, Defendants contend that summary judgment is warranted.

Not surprisingly, Plaintiffs disagree. First, Plaintiffs argue that they do rely on surveys or studies drawn from their participant populations. As Defendants note, however, this evidence merely relates to disease rates, smoking rates, and the costs of medical care. These surveys and stud-

ies do not link Plaintiffs' claimed damages to Defendants' alleged misconduct and are therefore not relevant and probative to the causation question at issue. For instance, Plaintiffs cite a study conducted by the HealthPartners Research Foundation measuring the impact of modifiable health risks on health care charges. (*See* Hoffman Aff. Ex. 46.) This study, however, only addresses the costs of smoking on health care. (*See id.* at 2235.) It fails to address whether any of Plaintiffs' participants relied on Defendants' alleged misconduct to their detriment.

Similarly, Plaintiffs claim that a recent government study of the smoking habits of Minnesota's youth links Defendants' deceptive advertising and promotional schemes to smoking rates in Minnesota students. (*See* Hoffman Aff. Ex. 38.) Once again, however, this study does not discuss, or even mention, Defendants' alleged misconduct. Instead, the only arguably pertinent portion of the study examines how many students were exposed to Defendants' advertising and promotions. (*See id.* at 35–37.) Even if the Court were to overlook the fact that this study does not distinguish between Defendants' allegedly fraudulent advertising and Defendants' non-fraudulent advertising, the study does not explicitly connect Defendants' advertising and promotion to smoking initiation or quit rates. The study merely concludes that "Children and teens are more sensitive to advertising: 88 percent of high school smokers usually smoke the top three brands." (*Id.* at vii.)

Finally, Plaintiffs contend that the deposition testimony of Dr. David Klevan provides direct evidence of causation in this case. Dr. Klevan, a clinician at one of Plaintiffs' clinics, testified that as a doctor responsible for treating smoker participants he "saw firsthand [beginning] in the late 1970s the fact that patients were addicted to nicotine." (*See* Hoffman Aff. Ex.

22 at 50.) He then goes on to claim that Plaintiff HealthParnters, Inc. ("HPI") could have reduced its health care costs related to smoking for three reasons: (1) smoking cessation products such as the nicotine patch or nicotine spray "could have been out much earlier" and could have been used more if "patients were more truthfully informed" (*id.* at 133); (2) "relatively safe nicotine instead of cigarettes ... could have [been invented] much earlier" (*id.* at 134); and (3) a nicotine analogue supposedly invented by Defendants "could have made a big difference." (*Id.* at 135.) What Plaintiffs deftly avoid noting, however, is that Dr. Klevan provides no basis for this opinion. In fact, he admitted in his deposition that he was only speculating in making these claims. (*See id.* at 141–44.) Accordingly, Dr. Klevan's testimony is simply insufficient to create a genuine issue of material fact regarding whether Defendants' alleged misconduct caused Plaintiffs' claimed damages.

In short, Plaintiffs' reliance on studies and surveys relating to smoking rates, disease rates, and the medical costs associated with smoking in general could only be relevant to causation if the Court adopted a strict liability regime in which Defendants were held liable for all of the costs of smoking related illness regardless of whether those costs were connected to any legally opprobrious conduct. While the holding of the court in *Group Health* provides an expansive reading of Minnesota consumer protection law, it does not endorse such a strict liability system.

Plaintiffs go on to argue, however, that surveys or studies drawn from populations other than their participant populations are sufficient to prove causation and damages in this case. With regard to their consumer protection claims, Plaintiffs complain that Defendants are merely trying to

resurrect the common law individual reliance rule, a rule conclusively laid to rest by the court in *Group Health,* by insisting that Plaintiffs rely on evidence drawn from their participants. After *Group Health,* Plaintiffs argue that all they need to establish is that Defendants' conduct had some impact on their participants' use of tobacco products.

Nevertheless, without showing that the surveys and studies on which they rely are representative of their participant populations, Plaintiffs cannot establish relevant and probative evidence of causation in this case. *See, e.g., King–Size, Inc. v. Frank's King Size Clothes, Inc.,* 547 F.Supp. 1138, 1158 (S.D.Tex.1982) (noting that if survey evidence "fail[s] to examine the proper universe, the survey must be discounted in its entirety"). Plaintiffs' argument essentially distills to the claim that "when you lie to people in Minnesota, you do it the same way as you lie to people in Massachusetts." (Mot. Summ. J. Tr. at 42.) Proving causation, however, requires Plaintiffs, "as a practical matter," to prove "reliance on the statements or conduct alleged to violate the statues." *Group Health,* 621 N.W.2d at 13. What Plaintiffs must show, to extend their example, is that because people in Massachusetts relied on the lie to their detriment, people in Minnesota likely would too. This, of course, requires the inference that people in Massachusetts and people in Minnesota would similarly perceive and then act on the lie. Without supporting evidence, this last "essential inference is left to conjecture and speculation." *See Lisa–Jet, Inc. v. Duncan Aviation, Inc.,* 569 F.2d 1044, 1048 (8th Cir. 1978). Because circumstantial evidence cannot create a genuine issue of material fact if a key inference is left to conjecture and speculation, *see Sip–Top, Inc. v. Ekco Group, Inc.,* 86 F.3d 827, 830 (8th Cir. 1996), the Court grants Defendants' Motion for Summary Judgment.

### 3. Expert Admissibility

██ Alternatively, summary judgment is appropriate in this case because the testimony of Dr. Jeffery Harris is inadmissible under *Daubert.*[5] Although Plaintiffs offer the testimony of no less than 14 experts, Plaintiffs have only one expert, Dr. Harris, who purports to provide the necessary causal link between Defendants' alleged misconduct and Plaintiffs' claimed damages.[6] Dr. Harris, an economics professor at the Massachusetts Institute of Technology and a treating physician at Massachusetts General Hospital, is eminently qualified to render a scientific opinion in this case. Nevertheless, Dr. Harris' testimony is only admissible under *Daubert* if it is relevant and reliable. *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786; *see also Peitzmeier v. Hennessy Ind., Inc.,* 97 F.3d 293, 296–97 (8th Cir.1996) (noting that it is incumbent on the Court to "act as a gatek-

---

5. Contrary to Plaintiffs' contention, it is appropriate to consider the admissibility of expert witness testimony during summary judgment. Additionally, if the expert testimony is inadmissible and the non-moving party is unable to generate a genuine issue of material fact without such testimony, it is appropriate to grant summary judgment. *See, e.g., Giles v. Miners, Inc.,* 242 F.3d 810–13 (8th Cir. 2001) (affirming summary judgment where testimony of plaintiffs' expert was inadmissible under *Daubert* ); *Peitzmeier v. Hennessy Indus., Inc.,* 97 F.3d 293, 297–99 (8th Cir. 1996) (same); *Cipollone v. Yale Indus. Prods.,* *Inc.,* 202 F.3d 376, 379–380 (1st Cir.2000) (same).

6. Plaintiffs also claim that Dr. Glenn Harrison has calculated damages in this case; however, this claim is undermined by Dr. Harrison's expert report which explicitly states that he does not calculate damages caused by Defendants' alleged misconduct. (*See* Bulinski Aff., Ex. D at 5.) Dr. Harrison, in fact, points to Dr. Harris as the witness who links Defendants' alleged wrongdoing to Plaintiffs' claimed damages. (*See id.*)

eeper in screening [proffered expert] testimony").

Expert evidence is relevant if it helps "the tier of fact to ... determine a fact in issue." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. For such evidence to be relevant, in other words, there must be, "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92, 113 S.Ct. 2786.

Expert testimony is reliable, if "the reasoning or methodology underlying the testimony is scientifically valid." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. As the Seventh Circuit has noted, however, an expert's opinion must not only be rooted in legitimate science, but the methodologies and techniques employed by the expert must be genuinely scientific. *See Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318–19 (7th Cir.1996) (stating that "the courtroom is not the place for scientific guesswork, even of the inspired sort"); *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 156–57, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (stating that even if an expert has used a scientifically valid theory or technique, that expert's testimony is inadmissible if the expert has inappropriately applied or adapted the theory); *Savage v. Union Pac. R.R. Co.,* 67 F.Supp.2d 1021, 1027 (E.D.Ark.1999) (citations omitted) (stating that "[e]ach step of the expert's methodology must be scientifically valid"); *United States v. Williams,* 95 F.3d 723, 729 (8th Cir.1996) (noting that plaintiffs' bear the burden of establishing that their experts' opinions rest of scientifically valid reasoning and methodology); *Coffey v. County of Hennepin,* 23 F.Supp.2d 1081, 1086 (D.Minn.1998) (same).

Ultimately, the goal of the trial court's gate-keeping function is to ensure "that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen,* 78 F.3d at 318. The personal opinion of an expert witness, no matter how impressive his or her credentials may be, is inadmissible under Fed. R.Evid. 702. *See id.* (stating that a trial court must "determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist"); *First Health Group Corp. v. United Payors & United Providers, Inc.,* 95 F.Supp.2d 845, 849 (N.D.Ill.2000). Doubts, however, about the admissibility of expert testimony should be resolved in favor of admission. *See Clark v. Heidrick,* 150 F.3d 912, 914 (8th Cir.1998) (citations omitted); *Nat'l Bank of Commerce v. Associated Milk Producers, Inc.,* 191 F.3d 858, 862 (8th Cir.1999) (citations omitted) (noting that it is not the court's role to weigh the expert testimony).

Because determining the reliability of expert evidence requires courts to assess the proffered evidence in the specific context of a given case, the Supreme Court has emphasized that "the test of reliability is 'flexible'" as is the trial court's ability to decide how to test an expert's reliability. *Kumho,* 526 U.S. at 141–42, 119 S.Ct. 1167; *see also United States v. Alatorre,* 222 F.3d 1098, 1102 (9th Cir.2000) (stating that "[t]he trial court must have ... latitude in deciding ... whether or when special briefing or other proceedings are needed to investigate reliability"); *Kirstein v. Parks Corp.,* 159 F.3d 1065, 1067 (7th Cir.1998) (stating that "[w]e have not required that the *Daubert* inquiry take any specific form"). In this case, notwithstanding Plaintiffs' contention that a *Daubert* inquiry is premature, the Court finds that there is ample evidence in the record on which it can determine the admissibility of Dr. Harris' testimony. Based on that record, the Court finds that Dr. Harris' testimony is speculative, inconsistent, and therefore unreliable.

Dr. Harris employs the well-accepted doctrine of attributional-risk theory to measure the costs attributable to Defendants' alleged misconduct. (See Bulinski Aff. Ex. A at 19.) Defendants do not challenge the attributional-risk theory in and of itself, so for the purposes of this Motion, the Court will assume its validity. Using the attributional-risk theory, Dr. Harris estimates the percentage of Plaintiffs' total health care expenditures attributable to smoking for each year in the damages period. Dr. Harris then postulates a "counterfactual" world in which fewer people would have smoked because Defendants would not have engaged in their alleged misconduct. Next, Dr. Harris uses the attributional-risk theory to calculate what Plaintiffs' health care expenditures attributable to smoking would have been in this counterfactual world. According to Dr. Harris, the difference between the estimates of smoking-related costs in these two worlds—the real world and the counterfactual world—equals Plaintiffs' damages in this case. (See Bulinski Aff. Ex. A at 38.)

For the purposes of this Motion, the key to Dr. Harris' model is the way in which he arrives at the number of smoking related costs in the counterfactual world. In Dr. Harris' words, he arrived at this number by focusing on "two macro questions": (1) how much faster would the relative risks of smoking have declined if there had been no misconduct by Defendants ("innovation effect"); and (2) how would the prevalence of smoking rates have changed over time if there had been no misconduct by Defendants ("information effect"). (See id. at 39.) To answer the first question, Dr. Harris considers the rate at which cigarettes would have become safer due to technological innovation in a world without Defendants' alleged misconduct. (See id. at 40–42.) To answer the second question, he considers how many people would have started to smoke ("initiation rate") and

how many people would have quit smoking ("quit rate") in a world without Defendants' alleged misconduct. (See id. at 39.) Dr. Harris does not, however, consider the relationship between the innovation effect and the information effect in his counterfactual world.

### a. *Innovation Effect*

Dr. Harris concludes that in the counterfactual world cigarettes would have been made approximately two and a half times safer almost two and a half times faster. (See id. at 41.) To reach this conclusion, Dr. Harris speculates that although in the real world the average yield of tar in a cigarette dropped from 37mg to 12mg over 41 years (1953 to 1994), this drop was achievable in no more than 12 to 16 years. (See id.) The basis for this claim, however, is notably absent from his expert report. Dr. Harris also speculates that a number of innovations, such as nicotine analogs, would have been available sooner but for Defendants' misconduct. (See id.) His "estimates of the dates when particular innovations were feasible [are] based on evidence as to what cigarette manufacturers had actually achieved. Had Defendants invested in R & D at a level appropriate for a competitive market, these particular innovations would likely have been achievable earlier." (Id.)

Dr. Harris apparently concludes what the appropriate level of investment in research and development should have been by noting that "the cigarette industry's actual R & D spending per dollar of sales during 1953–1980 was less than one-quarter that of the chemical industry and less than one-sixth that of the pharmaceutical industry during the same period." (Bulinski Aff. Ex. G at 33–34.) Without considering in more detail the relative business exigencies of the chemical industry, the pharmaceutical industry, and the cigarette

industry, however, this fact establishes very little.

Even taking the inferential leap of faith required to find that these three industries are substantially similar in their research and development needs and processes, the Court is left with nothing but Dr. Harris' bald speculation about the connection between money and innovation. How Dr. Harris knows that more money spent by Defendants on research and development would have equaled cigarettes becoming, or tobacco products being, two and a half times safer, two and a half times faster, is anyone's guess.

Not only is the innovation effect predicated on the mere speculation of Dr. Harris, but it also fails to establish how many, if any, consumers would have substituted putatively safer cigarettes or tobacco products for the less safe cigarettes. *See Estate of White v. R.J. Reynolds Tobacco Co.,* 109 F.Supp.2d 424, 434 (D.Md.2000) (stating that "plaintiffs must show that [deceased smoker] would have accepted and used the alternatively designed cigarette"); *Boerner v. Brown & Williamson Tobacco Co.,* 121 F.Supp.2d 1252, 1255 (E.D.Ark. 2000) (dismissing a case because "there [was] no evidence from which a jury could reasonably infer that [the deceased smoker] would have used any of the safer designs and thereby lessened the chances of contracting cancer"). In order to establish that Defendants' conduct stymied innovation which then caused Plaintiffs' harm, Dr. Harris would need to carefully define the characteristics of the putatively safer cigarette or tobacco product, estimate how consumer preferences such as taste would affect consumers' choice of those safer cigarettes or tobacco products, and take into account how potential price differences would affect consumers' ultimate choice of products. Dr. Harris fails to take these steps.

Even if the Court were to overlook these glaring deficiencies, Dr. Harris, in the end, does not know whether any particular innovations would be, in fact, safer. Indeed, Dr. Harris does not know whether cigarettes today are safer than cigarettes in 1954. (*See* Maledon Aff., Ex. 9 at 3676: 17–24.) Without evidence that the supposed innovation effect of Defendants' alleged misconduct actually resulted in less safe cigarettes, Dr. Harris' model is irrelevant to the causation question at issue.

b. *Information Effect*

Dr. Harris' information effect fares no better. According to Dr. Harris, in the counterfactual world, the initiation rate for smoking would have declined by 9 percent every year for the last fifty-five years. (*See* Bulinski Aff. Ex. F at 49.) Dr. Harris derives this figure by noting that smoking initiation rates in young men appeared to be dropping in the 1950's and early 1960's. (*See id.* at 48.) He claims that the fact that this decline halted in the mid–1960's and the fact that the initiation rates in young women increased during this period, is "consistent with the hypothesis that Defendants [sic] conspiracy successfully increased the rate at which new young smokers entered the market." (*Id.*)

> Specifically, Dr. Harris speculates that Defendants' success was attributable to three main factors: the disinformation campaign promulgated jointly by Defendants; the failure of Defendants to disclose what they knew about the addictive effects of nicotine; and the concerted use of lifestyle advertising aimed at youth, especially young women.

(*Id.*) Dr. Harris, however, provides no citation or basis for the conclusion that initiation rates slowed because of Defendants' misconduct. While it is possible that the decline in initiation rates was slowed by Defendants' misconduct, it is equally possi-

ble that the decline rates in initiation were slowed by host of other sociological factors. In the absence of scientific evidence or analysis, Dr. Harris' opinion that initiation rates would have continued to decline but for Defendants' alleged misconduct is at best the sort of inspired guess that the court in *Rosen* cautioned courts against accepting.

Finally, Dr. Harris contends that in the counterfactual world 4.5 percent of all participants who smoked would have quit smoking every year through the damages period. (*See* Bulinski Aff. Ex. F. at 48.) To arrive at this quit rate, Dr. Harris claims that he "examined the evidence on the impact of information about the health hazards of smoking." (*Id.* at 45.) By his own admission, however, the surveys and studies on which he relies focus on the impact of anti-smoking campaigns on quit rates. (*See id.* at 45–79.) These surveys and studies do not focus on the disinformation effect of Defendants' alleged misconduct and are therefore irrelevant to the issue of causation.

### c.  *Internal Inconsistencies*

As Defendants point out, Dr. Harris' model also fails to account for the impact of the innovation effect on the quit rates and initiation rates in the counterfactual world. If Dr. Harris is to be taken at his word, then initiation and quit rates are substantially influenced by the safety of cigarettes and tobacco products. Dr. Harris would have the Court believe that in his counterfactual world cigarettes and tobacco products would be nearly 2.5 times safer. Dr. Harris fails to consider, however, that if this were true, then as this improved safety was communicated to consumers, the decline in initiation rates might well slow and quit rates might well fall.

In the end, Dr. Harris' causation and damages model is precariously built on a

foundation of assumptions and speculation. As other courts have stated, "the proffering of an expert ... who will bless a guess-based theory will not suffice to withstand summary judgment." *Stokes v. L. Geismar, S.A.,* 815 F.Supp. 904, 910 (E.D.Va.1993), *aff'd,* 16 F.3d 411 (4th Cir. 1994); *see also Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 22 (2nd Cir.1996) (holding that the district court abused it discretion by allowing the testimony of an expert whose opinion was based on unrealistic and speculative assumptions). Contrary to Plaintiffs' assertion that any flaws in Dr. Harris' model merely affect the weight that his testimony should be given, the Court finds that these flaws are fatal to the admissibility of his testimony. *See Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 569 (D.C.Cir.1993) (stating that "in view of the patent flaws in [the expert's] testimony, we must resist 'the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it the weight it deserves'"). Accordingly, the Court alternatively grants Defendants' Motion for Summary Judgment on the ground that Dr. Harris' testimony is inadmissible under *Daubert* and its progeny.

### CONCLUSION

For the foregoing reasons, and based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment on Causation, Injury, and Damages (Clerk Doc. Nos. 213, 84) is **GRANTED.** **LET JUDGMENT BE ENTERED ACCORDINGLY.**