**Rosa Maria LOPEZ and Regions Bank, Plaintiffs**

**Special Administrator for the Estate of Isidro Lopez, Deceased**

**v.**

**Robert MENDEZ and Roadway Express, Inc., Defendants/Third Party Plaintiffs**

**v.**

**James Construction Group, L.L.C., Third Party Defendant.**

**No. 4:03CV000581 JLH.**

United States District Court, E.D. Arkansas, Western Division.

Sept. 2, 2004.

Ted Boswell, Clark S. Brewster, Boswell, Tucker, Brewster & Smith, Bryant, AR, for Plaintiff.

Bruce E. Munson, John O. Payne, Huckabay, Munson, Rowlett & Moore, Little Rock, AR, Jack M. Strauch, Womble, Carlyle, Sandridge & Rice, Winston–Salem, NC, for Defendant, Third–Party Plaintiff.

Elton A. Rieves, IV, Elton Rieves, III, Gary Shaun Hair, Jr., Rieves, Rubens & Mayton, West Memphis, AR, for Third–Party Defendant.

## OPINION AND ORDER

### J. LEON HOLMES, District Judge.

This action arises out of a motor vehicle accident that occurred shortly before 1:00 a.m. on August 22, 2002, in a construction zone at the junction of Interstate 440 East and Interstate 40 East in Pulaski County, Arkansas. Rosa Lopez and Regions Bank, as Special Administrator for the Estate of Isidro Lopez, Deceased ("Lopez"), allege that the negligence of Robert Mendez, a driver for Roadway Express, Inc., and James Construction Group, L.L.C. ("James"), caused the accident.

James entered into a contract with the Arkansas Highway and Transportation Department ("AHTD") for Job B60105, which included highway improvements and paving work where Interstate 440 intersects with Interstate 40. Construction was ongoing when the accident took place. The accident occurred when Mendez attempted to exit Interstate 440 and enter Interstate 40 eastbound via a temporary ramp constructed by James. James had placed a "Stop" sign at the end of the temporary ramp to cause traffic to stop before entering Interstate 40. Mendez's truck struck a car parked at the stop sign, crossed two eastbound lanes of Interstate 40, the median, and two westbound lanes of Interstate 40 and finally struck the Lopez automobile, which was leaving Interstate 40 westbound on an exit ramp on the opposite side of the highway from the temporary ramp.

The initial complaint named Mendez and Roadway as defendants but not James. Mendez and Roadway filed a third-party complaint against James. After James filed its third-party complaint, Lopez amended the complaint to name James as a defendant. James has moved for summary judgment, arguing the defense of acquired immunity precludes liability on its part.

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial responsibility of informing the district court of the basis of its motion and identifying the portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 763 (8th Cir.2003). When the moving party has carried its burden under Rule 56, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1985) (quoting Fed.R.Civ.P. 56(c)). The non-moving party sustains this burden by showing that "there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. If the evidence would allow a reasonable jury to return a verdict for the non-moving party, summary judgment is not appropriate. *Derickson v. Fidelity Life Assoc.*, 77 F.3d 263, 264 (8th Cir. 1996). In deciding a motion for summary judgment, the Court must view the facts

and inferences in the light most favorable to the party opposing summary judgment. *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir.2001).

Arkansas recognizes the doctrine of acquired immunity:

> The doctrine of acquired immunity provides that a contractor who performs in accordance with the terms of its contract with a governmental agency and under the direct supervision of the governmental agency is not liable for damages resulting from that performance. (citations omitted.) Under this theory, 'a contractor for a public agency shares the sovereign immunity of the public body from liability for incidental damages necessarily involved in the performance of the contract.' (internal citation omitted.)

*Smith v. Rogers Group, Inc.*, 348 Ark. 241, 250, 72 S.W.3d 450, 455–56 (2002). However, "this doctrine does not protect a contractor who performs a contract in a negligent manner resulting in damages to others." *Id.* In *Engelhardt v. Rogers Group, Inc.*, 132 F.Supp.2d 757, 759 (E.D.Ark.2001), the court explained, "contractors can be responsible for their negligent acts done independently of the state agency; negligent acts done independently for its own private ends and convenience; and for negligence committed during the performance of the contract."

In support of its motion for summary judgment, James filed affidavits from Scott Eldridge, the AHTD inspector who inspected the construction zone to ensure compliance with the contract; Brad Fryar, the resident engineer of the AHTD when Job B60105 went to contract; and Jeffrey Bise, the traffic control supervisor for James during the time of the accident. According to the affidavits of Eldridge and Bise, James had not "deviated from the engineer's instructions, the contract terms, plans, drawings or the standard specifications provided by the [AHTD] in connection with this construction site where the accident occurred, or prior thereto." Fryar stated that, to his knowledge, James was "fully in compliance with the terms, conditions, drawings, plans and specifications of the contract, ... with respect to traffic control, information, and warning devices and traffic maintenance." Eldridge further stated that he drove through the site around 7:30 p.m. on the night before the accident and personally observed the correct placement of all traffic control, information, warning devices, and in particular, the "Stop Ahead" signs that are at issue.

In response to these affidavits, the non-moving parties have set forth specific facts, as required by Rule 56(e), showing that there are genuine issues for trial. *Cf. Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 469–70 (8th Cir.1991).

The contract required that James construct and complete the work according to plans and specifications provided by the AHTD. As part of ensuring the safety of the public in and around its construction site, James had the duty to inspect all traffic control devices in use and to ensure that the equipment conformed to the standards of the Manual on Uniform Traffic Control Devices for Streets and Highways ("MUTCD"). Whether James' actions or omissions breached any such duties under the contract requires the resolution of several issues of fact.

First, genuine issues of material fact exist regarding whether James had erected the "Stop Ahead" signs required by both "Sheet 35" and the MUTCD warning motorists of the "Stop" sign at the end of the temporary ramp. Sheet 35 is the drawing of the AHTD-designed construction plan governing the construction of the temporary ramp, as well as the traffic control devices to be utilized on the ramp.

According to James, this plan had been orally modified to allow the use of "Stop" and "Stop Ahead" signs rather than the "Yield" and "Yield Ahead" signs that were specified in Sheet 35. James admits that, as orally modified, Sheet 35 would require "Stop Ahead" signs. The parties dispute, however, whether these signs were in place when the accident occurred.

Bise testified that he put the required "Stop Ahead" signs in their proper place on the night of the accident. He also testified that the signs were in place when he returned to the accident scene at 2:30 a.m. Eldridge testified that the "Stop Ahead" signs were in place when he inspected the site before leaving around 7:30 p.m. on the night before the accident.

The testimony of other witnesses, though, calls this testimony into question. In the police report, Trooper Michael Dawson identified the construction warning signs as follows:

Interstate 440 EB at state highway to overpass, construction warning signs begin "Road Work 1 Mile" signs on both sides of I-440 E.B. Flashing sign reading "Be Prepared to Stop" "I40 E.B. Detour Exit," "Ramp Speed 35 M.P.H." "Road Work Ahead" signs on ramp and barrels. Signs begin approx. .70 miles west of A.I.

Trooper Dawson mentioned no "Stop Ahead" sign in his report. Roadway's Terminal Manager, Gerald Bishop, drove onto the accident scene soon after the accident. In order to bypass traffic, Bishop drove on the shoulder of Interstate 440 East through the area where the "Stop Ahead" signs were to be erected. He testified that he saw no "Stop Ahead" signs. He also testified that, if the signs had been in place, he would have had to run over them because he drove on the shoulder where the signs would have been. Additionally, neither Mendez nor Davie Franklin, the driver of the stopped vehicle which Mendez first struck, recalled seeing "Stop Ahead" signs. Franklin testified as follows:

A: What I'm—what I'm saying is where I got into this point here (indicating), my headlights shined there. I could see the curve—the stop sign.

Q: Is that when you were first aware that you were going to have to—to stop down at the end of this ramp before you got up onto the roadway?

A: I was aware that I was going to stop when I first saw the stop sign.

Q: No, my question to you is, when you actually saw the stop sign, is that the first notice you had that you were going to have to stop before getting up onto the roadway?

A: That I recall.

When the facts are viewed in the light most favorable to the non-moving parties, and all reasonable inferences are drawn in their favor, this evidence creates a genuine issue of material fact. It may be that the "Stop Ahead" signs were in place and that Bishop, Franklin, and Mendez, as well as Trooper Dawson, overlooked them; but the fact that none of these persons saw or recalled seeing the "Stop Ahead" signs is some evidence that they were not in place. Whether to conclude that all of these persons overlooked signs that were in place, or whether to conclude that the signs were not in place, despite the testimony of Eldridge and Bise, is for the jury to determine.

Second, an issue of fact exists as to the control and contents of a portable flashing message board that was to be placed on Interstate 440, just north of the Highway 70 overpass, less than a mile from the accident site. James contends that the content of the message was under the sole control of the AHTD, so any discrepancy as to its contents on the night in question was the sole responsibility of the State of

Arkansas. Lopez and Mendez assert that James was contractually required to comply with any instructions from Eldridge, who represented the AHTD on this job, regarding the content of the message boards. There is testimony that Eldridge did instruct Bise as to which messages to place on the message board when the temporary ramp was being used. Eldridge testified:

Q: You specifically directed James Construction to make the flashing message board say "Stop Ahead"; right?

A: Right.

Q: And that's because it would have been dangerous not to have a flashing message board say "Stop Ahead"; right?

A: It could have been.

Q: And it certainly wouldn't have been in compliance with the contract or the specification if it didn't say "Stop Ahead"; right?

A: It would have been dangerous, so it wouldn't have complied with the contract.

Eldridge testified that the message board in question was operational and read, "Caution Caution Caution, Detour Ramp, Stop Ahead, something to that effect." However, several witnesses testify differently and state that the message board read, " 'I–40 E.B. Detour Exit' 'Ramp Speed 35 m.p.h.' 'Be Prepared to Stop,' " not "Stop Ahead" as directed by Eldridge. On the other hand, Mendez testified in his deposition that he did not see a flashing message board, so James argues that the dispute as to the content of the message is not a material issue. In view of the ruling on other issues, the court need not decide at this time whether the dispute regarding the message on the flashing board is a material issue.

Next, genuine issues of material fact exist as to whether the temporary ramp was shaped as required by the AHTD and whether the shape caused or contributed to the accident. Photographs of the temporary ramp show that it did not have the shape specified on Sheet 35. Sheet 35 depicts a ramp curving gently to the right in an arc similar to the arc of the permanent ramp. Photographs show that the temporary ramp as constructed turned left from Interstate 440 and intersected with Interstate 40 at an angle much nearer to 90 degrees than the ramp as depicted on Sheet 35. Eldridge testified:

Q: Did you tell James Construction to build the temporary ramp in a shape different than is shown on Sheet 35?

A: We had to change the location due to a drainage structure.

* * *

Q: So did you have to change the shape of the ramp to deal with the drainage structure or just the location of it?

A: The location.

Q: So the shape of the ramp should have been the same?

A: The shape of the ramp is pretty much the same as what was called for.

If James deviated from Sheet 35 in constructing the temporary ramp in a way that did not comply with the contract, there is also a dispute as to whether such a deviation could have caused or contributed to the accident. Bise testified as follows:

Q: And the temporary ramp shown on Sheet 35 does not curve back to the left at all, does it?

A: No.

Q: And by curving to the right, it provides a smooth, gradual transition onto the ramp, doesn't it?

A: Yes.

Q: If it curved back to the left, it wouldn't be as smooth and as gradual a transition, would it?

A: No.

Q: It wouldn't be as safe, would it?

A: No.

However, when asked whether he agreed with Bise's assessment of the safety of the altered shape, Fryar stated that "[g]iven the fact that there's a stop condition there, as you have said, on the night of the accident, I would not agree with that." In view of this conflicting testimony, a genuine issue of material fact exists as to whether the shape of the temporary ramp was safe.

Finally, genuine issues of material fact exist as to whether the number and spacing of traffic barrels used by James on the temporary ramp complied with the contract. Sheet 35 specifies that thirty-two traffic barrels were to be used in guiding traffic onto the temporary ramp. Fourteen of these barrels were to close off the regular ramp and the rest were to channel traffic onto the temporary ramp. When asked whether he instructed Bise to reduce the number of barrels, Eldridge testified that he did not:

Q: Did you tell Mr. Bise to use a different number of drums than is shown on Sheet 35?

A: I think there was a different number of drums used.

* * *

Q: Did you tell Mr. Bise to use a different number of drums across the regular ramp than is shown on Sheet 35?

A: I just told him to tighten the drums up. That was my only instruction to him.

Q: So your instruction was to tighten the drums, not to use a different number of drums; is that right?

A: To tighten the drums, whatever that—usually what he did was bring out more drums and put them in between the existing.

Nonetheless, Bise testified that the number of barrels he placed on the regular ramp that night was "six or seven, something like that." A police photograph shows seven barrels. Lopez and Mendez argue that, with fewer barrels in use, the taper that channeled drivers onto the temporary ramp was shorter, which produced less warning before vehicles were required to stop. James disagrees. Whether the placement of the barrels was a deviation from the plans provided by the AHTD and, if so, whether it constituted negligence on the part of James are factual issues that preclude summary judgment.

## CONCLUSION

Because the evidence in the record could support a reasonable fact-finder's decision for or against James, genuine issues of fact preclude summary judgment. *Riedl v. General American Life Ins. Co.*, 248 F.3d 753, 759 (8th Cir.2001). *Cf. Muskogee Bridge Co., Inc. v. Stansell*, 311 Ark. 113, 842 S.W.2d 15 (1992). James' motion for summary judgment (Docket # 51) is DENIED.